AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the  
Southern District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>White Xperia cell phone<br>Seizure No. 2020250600095401-003<br>("Target Device") | Case No.  '20 MJ5448 |

**APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the __Southern__ District of __California__, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC Sec. 952 and 960 | Importation of a Controlled Substance |
| 21 USC Sec. 963 | Conspiracy to Import |

The application is based on these facts:

See Attached Affidavit, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Meaghan Queally*  
*Applicant's signature*

Meaghan Queally, HSI Special Agent  
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __telephone__ *(specify reliable electronic means)*.

Date: December 18, 2020

*Judge's signature*

City and state: San Diego, California    Hon. Karen S. Crawford, United States Magistrate Judge  
*Printed name and title*

# AFFIDAVIT

I, Special Agent Meaghan Queally, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for a warrant to search the following electronic device:

>   White Xperia cell phone
>   Seizure No. 2020250600095401-003
>   ("Target Device")

as further described in Attachment A, and to seize evidence of crimes, specifically violations of Title 21, United States Code, Sections 952, 960, and 963 as further described in Attachment B. The requested warrant relates to the investigation and prosecution of Julio Cesar RIVERA VELASQUEZ ("Defendant") for importing approximately 17.08 kilograms (37.65 pounds) of methamphetamine from Mexico into the United States. The Target Device is currently in the custody of Homeland Security Investigations and located at 9495 Customs House Plaza, San Diego, CA 92154.

2. The information contained in this affidavit is based upon my training, experience, investigation, and consultation with other members of law enforcement. Because this affidavit is made for the limited purpose of obtaining a search warrant for the Target Device, it does not contain all the information known by me or other agents regarding this investigation. All dates and times described are approximate.

## BACKGROUND

3. I have been employed as a Special Agent with Homeland Security Investigations (HSI) since 2007. I am currently assigned to the HSI Office of the Special Agent in Charge, in San Diego, California. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia.

4. During my tenure with HSI, I have participated in the investigation of various narcotics trafficking organizations involved in the importation and distribution of controlled substances into and through the Southern District of California. Through my

training, experience, and conversations with other law enforcement officers experienced in narcotics trafficking investigations, I have gained a working knowledge of the operational habits of narcotics traffickers, in particular those who attempt to import narcotics into the United States from Mexico at Ports of Entry.

5. I am aware that it is common practice for narcotics traffickers to work in concert utilizing cellular telephones. A common tactic utilized by narcotics traffickers is to smuggle controlled substances into the United States from Mexico by concealing the controlled substances in vehicles or on persons entering the United States at Ports of Entry such as the San Ysidro Port of Entry and the San Ysidro Mesa Port of Entry. With respect to the importation of narcotics in this manner, I am aware that narcotics traffickers in Mexico frequently communicate with the individual responsible for importing the concealed narcotics into the United States. These communications can occur before, during and after the narcotics are imported into the United States. For example, prior to the importation, narcotics traffickers frequently communicate with the transporter(s) regarding arrangements and preparation for the narcotics importation. When the importation is underway, narcotics traffickers frequently communicate with the transporter(s) to remotely monitor the progress of the narcotics, provide instructions and warn accomplices about law enforcement activity. When the narcotics have been imported into the United States, narcotics traffickers may communicate with the transporter(s) to provide further instructions regarding the delivery of the narcotics to a destination within the United States.

6. Based upon my training, experience, and consultations with law enforcement officers experienced in narcotics trafficking investigations, and all the facts and opinions set forth in this affidavit, I am aware that cellular telephones (including their SIM card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data,

remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones of individuals involved in the importation of narcotics may yield evidence:

    a.    tending to indicate efforts to import controlled substances from Mexico into the United States;

    b.    tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

    c.    tending to identify co-conspirators, criminal associates, or others involved in importation of controlled substances from Mexico into the United States;

    d.    tending to identify travel to or presence at locations involved in the importation of controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

    e.    tending to identify the user of, or persons with control over or access to, the Target Device; and/or

    f.    tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

**A. The Arrest**

7. On August 18, 2020 at approximately 11:45 AM, Julio RIVERA VELASQUEZ, ("RIVERA VELASQUEZ"), a United States citizen, applied for entry into the United States from Mexico through the Otay Mesa Port of Entry in vehicle lane #4. RIVERA VELASQUEZ was the driver and sole occupant of a 2013 Volkswagen Jetta ("the vehicle") bearing California license plates.

8. A Customs and Border Protection Officer received two negative Customs declarations from RIVERA VELASQUEZ. RIVERA VELASQUEZ stated he was

crossing the border to go to the DMV in San Ysidro, CA. During inspection, the officer noticed that the driver side rear door had something loose inside, and asked whether RIVERA VELASQUEZ had done any work on the vehicle. RIVERA VELASQUEZ stated that no work has been done to his knowledge and that he had just purchased the vehicle from a family member in San Jose.

9. A CBPO operating the Z-Portal X-Ray machine detected anomalies in the gas tank of the vehicle. A Canine Enforcement Team was conducting secondary inspection operations when the Human and Narcotic Detection Dog alerted to the back seat area of the vehicle. Further inspection of the vehicle resulted in the discovery of 34 packages concealed in the gas tank of the vehicle, with a total approximate weight of 17.08 kgs (37.65 lbs). A sample of the substance contained within the packages field tested positive for the characteristics of methamphetamine.

10. RIVERA VELASQUEZ was placed under arrest at approximately 1:30 PM. The Target Device was found in Defendant's pocket and seized by a Customs and Border Protection Officer (CBPO) who was tasked to perform a secondary inspection of the Vehicle and inventory all the property seized from the Defendant and his Vehicle.

11. RIVERA VELASQUEZ was charged in Case No. 20CR2822-CAB with violating 21 USC 952/960 and transported to the Metropolitan Correctional Center in San Diego, CA. A continued motion hearing is set for February 12, 2021.

**B. RIVERA VELASQUEZ's Statement**

12. RIVERA VELASQUEZ waived his *Miranda* rights and claimed that he had purchased the vehicle from an individual named "Jiovani LNU (last name unknown)" on August 10, 2020, for $2,200, and that he was on his way to the DMV to change the name on the title. He explained that he had met "Jiovani LNU" through a friend, Jiovani Avila Padilla. RIVERA VELASQUEZ claimed that the night before his arrest, he lent the vehicle to Jiovani LNU. According to the defendant, Jiovani LNU and Padilla returned the vehicle to him at 6:00 a.m. on August 18, 2020. Jiovani LNU gave Defendant $150 in order to pay

the DMV fees.

13. RIVERA VELASQUEZ denied knowledge of narcotics inside the vehicle, and denied he was paid to smuggle narcotics. He admitted that "Jiovani LNU" had asked him to smuggle drugs when they first met. Defendant also claimed that Padilla tried to convince him to smuggle drugs at that time.

14. During the interview, the Defendant was shown the Target Device and identified the Target Device as belonging to him. He also gave agents consent to search the Target Device by signing a written consent form.

**C. Crossing History**

15. Crossing history for RIVERA VELASQUEZ shows that in the previous 12 months, Defendant had approximately 7 prior crossings in the same vehicle he was arrested in, as well as 2 crossings as a pedestrian. Defendant's first crossing in the vehicle was on August 11, 2020, at 2:16 p.m. The vehicle went back to Mexico approximately one hour later. On August 12, 2020, Defendant drove the vehicle into the United States at approximately 11:02 a.m. The vehicle returned to Mexico at 1:26 p.m. The next day, on August 13, 2020, RIVERA VELASQUEZ drove the vehicle into the U.S. at 8:57 a.m. The vehicle was driven back to Mexico 12:31 p.m. the same day.

16. On August 15, 2020, Defendant made two trips in the vehicle. He first crossed the border into the United States at 6:25 a.m., with the vehicle returning to Mexico at 9:54 a.m. Defendant then drove across the border again at 11:31 a.m. The vehicle was driven back into Mexico 11 minutes later.

17. On August 17, 2020, Defendant likewise took two trips: once at 10:21 a.m. (returning at 11:57 a.m.), and the second time at 12:36 p.m. (returning less than 20 minutes later).

18. Defendant also crossed as a pedestrian on January 4, 2020, and June 7, 2020.

19. Prior to Defendant's trips in August 2020, the vehicle last crossed into the United States on March 30, 2020, and was driven back to Mexico on March 31, 2020.

20. The dates and times of Defendant's vehicle crossings appear to suggest that

RIVERA VELASQUEZ may have been "burning plates," a practice frequently used by smugglers to establish a crossing history. Based upon my experience and investigation in this case, I believe that RIVERA VELASQUEZ, as well as other persons as yet unknown, were involved in an on-going conspiracy to import methamphetamine or some prohibited narcotics. I also believe that RIVERA VELASQUEZ may have used the Target Device to coordinate with co-conspirators and to further this conspiracy both inside and outside the United States.

21. Drug trafficking conspiracies require intricate planning and coordination. This often occurs days, weeks, or even months prior to the actual importation of the drugs into the United States. Co-conspirators communicate with one another in efforts to ensure success in getting their valuable cargo to its destination within the United States. In this case, the vehicle where narcotics were found had no crossings from March 31, 2020, until August 11, 2020, when RIVERA VELASQUEZ first drove in it across the border. The narcotics were found hidden inside the gas tank of the vehicle. RIVERA VELASQUEZ was in possession of the Target Device at the time of his arrest. RIVERA VELASQUEZ also crossed the border twice as a pedestrian, most recently on June 7, 2020, approximately three months before his arrest. Based on my training and experience, it is also not unusual for individuals, such as Defendant, to attempt to minimize the amount of time they were involved in their smuggling activities, and for the individuals to be involved for weeks and months longer than they claim. The evidence supports that probable cause exists to search the Target Device for information dating back approximately three months prior to Defendant's arrest in this case on August 18, 2020. Accordingly, I request permission to search the Target Device for data beginning on June 1, 2020 to August 18, 2020.

## METHODOLOGY

22. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as

personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

23. Following the issuance of this warrant, I will collect the Target Device and subject it to analysis. All forensic analysis of the data contained within the telephone and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

24. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days of the date the warrant is signed, absent further application to this court.

### PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

25. As discussed above, during the course of the post-arrest interview on August 18, 2020, Defendant provided the HSI agents with written consent to search the Target

Device. Agents obtained a download of the Target Device; however, due to technical issues, the download is not accessible. Therefore, while the HSI might already have all necessary authority to examine the Target Device, I seek this additional warrant out of an abundance of caution to be certain that an examination of Target Device will comply with the Fourth Amendment and other applicable laws.

## CONCLUSION

26. Based on the facts and information set forth above, I submit there is probable cause to believe that a search of the Target Device will yield evidence of Defendant's violations of Title 21, United States Code, Sections 952, 960 and 963. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the item described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Special Agent Meaghan Queally
Homeland Security Investigations

Sworn and attested to under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 18th day of December, 2020.

_____
Honorable Karen S. Crawford
United States Magistrate Judge

## **ATTACHMENT A**

PROPERTY TO BE SEARCHED

The following property is to be searched:

> White Xperia cell phone
> Seizure No. 2020250600095401-003
> ("Target Device")

The Target Device is currently in the possession of United States Customs & Border Protection, located at 9495 Customs House Plaza, San Diego, CA 92154.

# **ATTACHMENT B**
ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of June 1, 2020, up to and including August 18, 2020:

a. tending to indicate efforts to import controlled substances from Mexico into the United States;

b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the importation of controlled substances from Mexico into the United States;

c. tending to identify co-conspirators, criminal associates, or others involved in importation of methamphetamine, or some other federally controlled substance, from Mexico into the United States;

d. tending to identify travel to or presence at locations involved in the importation controlled substances from Mexico into the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above;

which are evidence of violations of Title 21, United States Code, Sections 952, 960 and 963.